[Cite as *Clark v. Dir., Ohio Dept. of Job & Family Servs.*, 2025-Ohio-2222.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

SHALONDA TIARA CLARK,  :

    Plaintiff-Appellant,  :

                         No. 114386

    v.  :

DIRECTOR, OHIO DEPT. OF  :
JOB AND FAMILY SERV., ET AL.,

                        :

    Defendants-Appellees.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 26, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-24-997920

---

### *Appearances:*

Andrew S. Pollis, Supervising Attorney, and Adrienne L. Pohl, Legal Intern, Milton and Charlotte Kramer Law Clinic Center, Case Western Reserve University School of Law, *for appellant*.

David Yost, Attorney General, and Laurence R. Snyder, Senior Assistant Attorney General, *for appellee* Director, Ohio Department of Job and Family Services.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Shalonda Clark appeals from the Unemployment Compensation Review Commission's ("UCRC") determination denying her unemployment benefits

after appealing to the Cuyahoga County Court of Common Pleas, which affirmed the decision of the UCRC. After a thorough review of the record before us, we also affirm the UCRC.

## I. Factual and Procedural History

{¶ 2} On October 8, 2023, Clark filed an application for unemployment compensation with the Ohio Department of Job and Family Services ("ODJFS"). Clark's application indicated that she was hired at Brouse McDowell Legal Professional Association ("Brouse McDowell") on January 23, 2023, and was laid off on October 4, 2023, due to "lack of work." Her application was denied because ODJFS determined that in actuality, Clark was discharged with "just cause" for "being absent or tardy."

{¶ 3} In December 2023, Clark applied for redetermination, which was denied. She again appealed internally within the agency, and Clark's appeal was transferred to the UCRC and set for hearing on January 10, 2024, and February 1, 2024.

{¶ 4} Clark appeared at the hearing, as well as Miranda Fothergill-Shoup ("Fothergill"), a human resources employee at Brouse McDowell, and Cathy Green ("Green"), Clark's direct supervisor at Brouse McDowell.

{¶ 5} Green testified that Brouse McDowell's attendance policy is generally as follows:

> All non-exempt employees are expected to make any reasonable attempt to arrive on time, ready to work, every day they are scheduled. When an illness or other compelling reason necessitates an

unscheduled absence from work or reporting late, the professional support staff are to notify the firm as soon as they can by leaving a message on the firm call-off line and they have to give their name, date and expected date or time off, of when they're coming back. Any failure to show up or call in for, for a scheduled shift without prior approval may result in termination.

{¶ 6} Green testified that Clark's offer letter specified that her work hours were from 8:30 a.m. to 5:00 p.m. Green testified that after noticing Clark's consistent and repeated tardiness, she gave Clark a verbal warning on July 18, 2023, during a monthly checkpoint meeting. In furtherance of her testimony, Green submitted a document itemizing Clark's keycard swipes into the garage, showing the date and time that Clark swiped into the garage.

{¶ 7} Green testified that after Clark had been late without calling the call-off line an additional three times, Clark was given a written warning on August 7, 2023. Clark refused to sign the document but during the hearing, she acknowledged receipt of the document. After the written warning, Clark arrived late to work without calling into the call-off line four more times and Green discharged her on October 4, 2023.

{¶ 8} Clark cross-examined Green about the flexible work policy. Green responded that the flexible time policy "relates to if you have to go to a doctor, it allows you to have up to two hours per pay period to make that time up if it's reported ahead of time that you will be off . . . . It's not to be used for 'I'm late. I'll make up the time.'" When Green read the policy into the record, she admitted that "[i]t says

you have up to two hours of pay per period and it has to be made up within the same week. It doesn't specify anything about using it for being late."

{¶ 9} Clark also cross-examined Green regarding the schedules of several other employees who were considered "support staff," including "Hannah, Sarah, Kelly, [Fothergill,]" and Green, herself. Clark submitted evidence consisting of numerous screenshots from Microsoft Teams showing various times where these specific individuals were not online and working after 8:30 a.m., as well as department-wide emails indicating the absences and late arrivals for the day. Clark argued that these documents demonstrated that other employees were also late numerous times, but none of them were fired for being late. Green responded that "this has nothing to do with anyone else other than you. Your work hours were eight-thirty to five and you were late." Green stated that each of those employees either had a different work schedule or negotiated their schedules at the time of hire, but they nevertheless followed the protocol of calling into the firm's call-off line even if they were going to be one minute late, the protocol that Clark failed to follow.

{¶ 10} When Clark asked why her work was taken away and given to other employees, Green responded that Clark "was not keeping up with her job and collections were slow. The other two, I asked to step in and help. But none of that has anything to do with her being tardy or why she was dismissed."

{¶ 11} Contrary to Green's testimony, Clark testified that she did not have a designated work schedule and that she "had flexible time to come in," elaborating

that she understood that she could come in at any time so long as she worked 7.5 hours per day.

{¶ 12} Regarding the meeting on July 18, Clark testified that it was a conversation that occurred on July 21. She explained,

> Cathy came to my desk and she asked what were the hours that I worked yesterday and I told her that I worked until six-thirty, after 6:30 p.m. and she told me that I couldn't put that on my timesheet. And I told her that I was going to put it on my timesheet because I worked it and she told me to work those hours. And Cathy became upset so I showed Cathy my emails and I showed her that I had worked those hours and that I was sending emails at those hours. And when I showed her the proof she said that I needed to be there every day at eight-thirty and that I couldn't use flex time and that I could not put those hours on my timesheet.

{¶ 13} The hearing officer noted that despite Clark acknowledging this verbal warning, Clark arrived after 8:30 a.m. at least twice based on the data provided in the garage swipes report. The hearing officer asked Clark, "Why did you continue to be in after eight-thirty after that conversation?" Clark answered, "[W]hen I was hired I was told that I had flex time and that was a policy that was given to me by the company and that everyone was still using."

{¶ 14} Clark testified and corroborated that on August 7, she was given a written warning regarding her tardiness. She testified that she did not sign the written warning because she disagreed with it. Noting that the garage swipe data indicated that Clark was tardy four more times after this written warning, the hearing officer asked Clark why she continued to be tardy. Clark stated, "I had a flexible time policy. I had a flexible time policy and that is what was told to me when

I started working there and an employer cannot have a policy and then take it away just to target one individual."

{¶ 15} Following the hearing, the UCRC issued an opinion affirming ODJFS's December 12, 2023 redetermination, finding that Clark had been fired for just cause rather than being laid off due to a lack of work, as Clark originally specified in her application.

{¶ 16} Clark filed an administrative appeal in the Cuyahoga County Court of Common Pleas, appealing the ODJFS and UCRC decisions denying Clark unemployment compensation.

{¶ 17} After the matter was fully briefed, the court issued a decision, finding that "the Ohio Unemployment Compensation Review Commission's decision was not unlawful, unreasonable or against the manifest weight of the evidence and is affirmed."

{¶ 18} Clark now appeals to this court, assigning the following error for review:

> The agency's decision to deny unemployment benefits — based on the finding that Ms. Clark was fired with just cause — was against the manifest weight of the evidence, and the trial court erred in holding otherwise.

## II. Law and Analysis

{¶ 19} Pursuant to R.C. 4141.282(H), "[i]f the court finds that the decision of the commission was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or modify the decision, or remand the matter to the

commission. Otherwise, the court shall affirm the decision of the commission." This applies to "'all reviewing courts, from the first level of review in the common pleas court, through the final appeal in the Supreme Court of Ohio.'" *Boynton v. Dir., Ohio Dept. of Job & Family Servs.*, 2022-Ohio-2597, ¶ 8 (10th Dist.), quoting *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 696 (1995). A reviewing court is not permitted to make factual findings or reach credibility determinations, but instead must determine whether the decision is supported by evidence in the record. *Tzangas* at 696. "If such evidence is found, the court may not substitute its judgment for that of the UCRC." *Warner v. Ohio Dept. of Jobs & Family Servs.*, 2023-Ohio-3157, ¶ 11 (8th Dist.), citing *Wilson v. Unemp. Comp. Bd. of Rev.*, 14 Ohio App.3d 309, 310 (8th Dist. 1984).

{¶ 20} R.C. 4141.29(D)(2)(a) provides that a claimant is ineligible for unemployment benefits if they were discharged with just cause. In determining that Clark was discharged with just cause, the UCRU made the following findings of fact:

> The employer is a Law Firm. [Clark] was employed in the Accounts Receivable/Collections Department as a Coordinator at the Firm's Akron office location for the period January 23, 2023 — October 4, 2023. [Clark] was terminated for issues related to time and attendance.

> At the time of her hire, [Clark] was provided with an offer letter, which included her designated working hours. 'Your standard 37.5 hour work week will be Monday through Friday, 8:30 AM to 5:00 PM, with an hour for lunch. Occasional hours outside of your standard schedule will be required as Firm needs demand.'

> The employer's written Time Reporting Policy states, in relevant part, 'if an employee is going to be late . . . he or she must leave a message on the Firm's call-off line prior to the start of the workday[.]' The

employer does not have any formal step or progressive corrective action policy for time and attendance issues.

[Clark] was verbally warned about her tardiness to work on or about July 21, 2023. At the time, a review of garage swipe records revealed that [Clark] had not even been into the office on time (she was not at her desk ready to work) on no less than 61 occasions. [Clark] was advised that her start time was 8:30 am[,] and that she could not just flex her schedule at her convenience. [Clark] was also reminded that if she was going to be late, she was required to call-in and report her tardiness pursuant to policy.

[Clark] was issued a written warning for time and attendance on August 7, 2023, after [Clark] had addition[al] tardy occurrences following her verbal warning, and, she failed to call-in in advance to advise that she was running late to work. The warning reminded claimant that her designated start-time was 8:30 am, and that 'from this point forward, you must arrive at work no later than 8:30 am each day.'

[Clark] was also advised that failure to meet this expectation may result in further disciplinary action, up to and including her termination. [Clark] refused to sign the warning.

Thereafter, [Clark] had tardy occurrences on August 30, 2023, September 25 and 26, 2023; and, October 2, 2023. [Clark] also failed to report her tardiness in advance pursuant to policy on each of these four occasions[.]

[Clark] was terminated on October 4, 2023, as a result of her ongoing tardiness; coupled with her failure to call-in and report her tardiness pursuant to policy.

{¶ 21} On appeal, Clark argues that the UCRC's evidence in the record fails to support a just-cause termination for three reasons: (1), the employer "relied on unauthenticated third-party garage swipe evidence, rather than its own internal human-resource records, to establish tardiness and offered an explanation for doing so that suggested the employer's own records would not have been supportive of its

decision;" (2), "the employer's policy was ambiguous and inconsistently enforced;" and (3), "the instances of alleged tardiness giving rise to Ms. Clark's termination were de minimis." She also argues that the UCRC's decision was against the manifest weight of the evidence.

## A. Garage Swipe Evidence Proffered Over Employer's Own Records

{¶ 22} Clark complains that Brouse McDowell did not produce data from its own human resources time-reporting software and conceded that "only by resorting to the garage records could it demonstrate the tardiness it claimed justified the termination." Clark further asserts that the garage swipe records were unauthenticated.

{¶ 23} This challenge goes to the UCRC's findings of fact and credibility, and we find that the record supports the UCRC's reliance on the garage records. During the hearing, Green established that the internal time-reporting software is self-reported by the employee and that the garage swipes show the exact time that Clark swiped into the garage. Green explained that after swiping into the garage, Clark had to swipe to proceed to a catwalk and then swipe into the office before she arrived at her desk and began working. Clark specifically cross-examined Green about failing to produce the swipes from the office door, as well as the fact that Green did not pull garage records for another employee whom Clark believed was consistently late. Green admitted that these were garage entrance and exit records only, but explained that these were just the times that Clark had swiped into the garage, excluding the time it took her to get to her desk and begin working. Green indicated

that the employee to whom Clark referenced was a Pennsylvania employee who did not park in a garage for work.

{¶ 24} On these facts in the record and for the reasons discussed above, we find that the UCRC's reliance on the garage swipe data in finding that Clark was tardy on numerous occasions, including after she received a verbal and written warning cautioning her against being late, was not against the manifest weight of the evidence.

## B. Ambiguous and Inconsistent Enforcement of Late Arrival Policy

{¶ 25} Clark also points out that Brouse McDowell's late arrival policy was ambiguous and unfairly enforced and administered. She relies on *Williams v. Ohio Dept. of Job & Family Servs.*, 2011-Ohio-2897, ¶ 22, holding that although not defined by statute, "just cause" has been understood by numerous Ohio courts as cause that an ordinarily intelligent person would find justifiable. *Williams* reiterated that "termination pursuant to company policy will constitute just cause only if the policy is fair, and fairly applied." *Id.* at ¶ 28, citing *Harp v. Admr., Bur. of Unemp. Comp.,* 12 Ohio Misc. 34, 35, (C.P. 1967). However, "'the fairness of a company policy is necessarily limited to a determination of whether the employee received notice of the policy; whether the policy could be understood by the average person; and whether there was a rational basis for the policy. The issue of whether the policy was fairly applied relates to whether the policy was applied to some individuals but not others.'" *Id.*, quoting *Shaffer v. Am. Sickle Cell Anemia Assn.*, 1986 Ohio App. LEXIS 7116, *5 (8th Dist. June 12, 1986).

{¶ 26} Clark likens this case to *State ex rel. McKnabb v. Indus. Comm. Of Ohio*, 92 Ohio St.3d 559 (2001), a workers' compensation case, where the Court relied on the employer's enforcement of a tardiness policy after the workers' compensation claim was filed. Clark argues that consistent with *McKnabb*, Brouse McDowell, in failing to enforce their attendance policy until July 2024, indicated to Clark that it tolerated her repeated tardiness and, therefore, the "handful of minor late arrivals that supposedly triggered her termination do not qualify as just cause." We find that *McKnabb* is inapplicable to the instant case.

{¶ 27} Although there is evidence in the record suggesting selective enforcement, given our scope of review, we find that the record supports the UCRC's finding that the policy was fair and fairly applied. Clark's hiring letter specified that her hours were 8:30 a.m. to 5 p.m. with an hour for lunch. The time reporting policy document specifically provides that "[i]f an employee is going to be late or out of the office for the day, he or she must leave a message on the Firm's call-off line prior to the start of the workday." While Clark insisted that this policy was not enforced for any of the other members of the support staff, Green conversely testified that everyone except Clark followed the procedure and called the call-off line, even if they were "one minute" late. Green also testified that Clark would not have access to other employee's timekeeping files and calls into the call-off line, so Clark's screenshots of other employees being offline at their scheduled work time only demonstrate that they were not online by 8:30 a.m., not whether they called the call-off line or had made a prior negotiated change to their work schedule.

{¶ 28} Accordingly, the record supports the UCRC's finding that Brouse McDowell's policy was unambiguous, fair, and fairly administered.

## C. De Minimus Violations and Correction After Warning

{¶ 29} Clark's final argument asks this court to consider that "Clark fixed [her tardiness] as she understood it, she never again [sic] by more than 11-12 minutes . . . which she reasonably believed was responsive to the warning." Clark, however, acknowledges that this involves fact-finding, which is beyond this court's scope of review.

{¶ 30} Our review is constrained to whether the record supports a finding that Clark did not remedy her tardiness issue that resulted in a verbal and written warning. Clark herself admits that she continued to be late after the warnings were given, albeit "by no more than 11-12 minutes." Accordingly, the record supports the UCRC's finding that Clark did not rectify her tardiness issue and continued to be late after receiving a warning and, thus, the record supports the UCRC's finding that she was terminated for just cause.

### III. Conclusion

{¶ 31} After a thorough review of the record before us, we cannot say that the evidence in the record does not support the findings of fact challenged by Clark and, therefore, the determination that Clark was discharged with just cause was not against the manifest weight of the evidence.

{¶ 32} Judgment affirmed.

It is ordered that appellee, Ohio Department of Job and Family Services recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EMANUELLA D. GROVES, P.J., and
ANITA LASTER MAYS, J., CONCUR